SM

1  Arthur Thyme
2  1050 S. Van Ness
   San Francisco, CA 94110
3  415.623.0355 (cl)
   frank.wright9@gmail.com
4



**RECEIVED**

DEC 2 8 2022 SMB

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

5

6

7              IN THE UNITED STATES COURT DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF ILLINOIS

9

10  Arthur Thyme,                        22-cv-7312
11        Plaintiff,                     Judge Tharp
                                         Magistrate Judge Harjani
12  v.                                   RANDOM

13
    Haravon, Hughes & Willis LLP,              )
14        Defendants.                          )
15                                             )

16

17

18

19

20

21

22

23

24

25

26

27

28

No.                                                    Page 1 of 9
Complaint

## I. Introduction

This complaint is brought under an alias by Jesse F. Swartz, Jr. (**PLEASE DO NOT CITE ACTUAL NAME IN PRE-TRIAL ORDERS**) versus an entity and persons[1] with whom he was formerly socially active.

## II. Venue and Jurisdiction

Jurisdiction and venue are proper pursuant to 28 U.S.C. § 1331.

## III. Claims

(1) Conspiracy under 720 ILCS 5/8-2;
(2) Defamation pursuant to 740 ILCS 145;
(3) Violation of Amend. XIV, Sec. 1 (U.S. Const.);
(4) Violation of the RICO Act under 18 U.S.C. Sec. 1957 *et seq.*

## IV. Facts and Interpretation in Support of Claims

A. <u>Does a group of friends meet the definition of an unlawful enterprise under RICO?</u>

Plaintiff was formerly a part of a social network via a group of friends now inhabiting several states (Ohio, Illinois, and Colorado). Within the last 2 years, plaintiff visited Chicago, IL where one of those friends, David Streicker, resides with his wife and children. Prior to the 2020 visit to their home, plaintiff and Mr. Streicker had not been at odds, but several of plaintiff's phone calls and letters sent from 2014 through 2020 went unanswered, those phone calls and letters related to legal matters where Mr. Streicker may have maintained relevant competency and an ability to assist. The non-response was not only out of character, it was oddly condescending and disrespectful.

As a result, and to discover root cause, plaintiff paid a visit to their residence in Evanston, IL. He briefly spoke to Mr. Streicker's wife, was courteous at all times, but noted that Jenny, Mr. Streicker's wife, did not invite him into the home. He asked her if Mr. Streicker was upset about not repaying a $350 debt he had accrued ca. 2009. Mrs. Streicker responded that neither she nor Dave were upset

---

[1] The LLP is a pseudonym for Ed Haravon, Michael Hughes and Matt Willis.

about the outstanding debt. Plaintiff asked if she or Dave were angry for some unknown reason; she responded in the negative and, after a bit of conversation, plaintiff departed. Before departing, he asked her to let Mr. Streicker know he'd like to meet up soon. He was polite and courteous, but guarded.

About 30 minutes later, David Streicker appeared at the train station where plaintiff awaited a train back to Chicago. Plaintiff did not recognize Mr. Streicker, called out his name as he approached (he did not identify himself and wore a balaclava) and Dave self-identified. Plaintiff asked "How are you Dave?" Dave shook his head and said sternly "Not good, it's all this COVID." His approach, terseness and demeanor communicated anger and hostility, the very manner plaintiff intended to read and comprehend via in-person visit.

Mr. Streicker issued a firm warning: "Don't come to my house again." The instruction was so out of character and without predecessor basis that it took plaintiff by semi-surprise. Silence and non-response to phone calls requesting assistance left some amount of confusion or questionable cause, but what he displayed in person was rage, superiority, accusation and an immense amount of disrespect when compared to the 15 years during which they had been acquainted. It was as if plaintiff was returning from a stint in prison for date-raping Mr. Streicker's wife's best friend.

Plaintiff attempted to comprehend root cause by asking the nature of the problem. At one point, he asked "Dave, after I left [Chicago] in 2010, there were no problems between us, correct?" He answered, with an angry tone, "No, no problems then." The reason plaintiff posed the question was that the two never corresponded or spent time together thereafter; in other words, any just cause warranting anger aside the $350 unpaid debt would have occurred prior to plaintiff departing the Chicagoland area ca. 2010.

So what was David Streicker communicating and why was he angry or hostile?

This suit, partially brought under high probability speculation, suggests that an interconnected group of friends inclusive of David Streicker, those friends inhabiting multiple states, have acquired false information (i.e., defamatory innuendo or actual content), passed that content across state lines repeatedly, adjudged and/or acted upon it and, via their errant judgments, conspired to, and actually harmed, plaintiff. This suit intends to compel discovery in order to:

(1) Based upon prior interactions, assess the psychological states of the group;
(2) Speculate, based upon statistical probability, what information has been collected, distributed and acted upon, if possible;
(3) Acquire all negative information contained and transmitted within the apparently malfeasant social network and diffuse or refute that information into a corrected state.

B. <u>What causes tortious acts such as defamation to occur?</u>

There are two pieces of apparent information which his formal social network may have acquired, both components false or wrongfully assessed:

1. Was plaintiff abusive during marriage?

As Ms. McInerney initiated the divorce, innuendo suggests that plaintiff had "performed wrong" as root cause for the marital dissolution. Ms. McInerney grew up on the North Shore of Chicago, was friends with the Haravons - Kara and Ed both attended Miami University (OH) with plaintiff (1993-1995) - and thus Ms. McInerney was likely connected to the Haravons, and their broader mutual social circle between 2009 and present. Between 2009 and present, plaintiff was not socially active with the group of people references as "the social circle."

David Streicker's reaction, and the odd silence which has surrounded him for the past 13 years, suggests a belief or adjudgment within that circle has been rendered: Plaintiff has performed an immense wrong, perhaps tied to his marriage, and is expelled. As he performed no immense wrongdoing, the judgment, which we presume as potential root cause for the behavioral change, would be erroneous.

//

No.
Complaint

2.  Did plaintiff require punishment for embarrassing and/or insulting a mutual friend?

During two social events our client does not recall (2002-2008), he apparently called a mutual friend "a whore." There are three pertinent points relevant to this apparent wrongdoing as to proper assessment and adjudgment:

(a) Plaintiff does not recall the acts he was accused of performing and, as such, they may not have occurred[2];

(b) Lisa Schrader's sexual trysts with a former roommate of plaintiff's, if true, materially meets one of the definitions found within Webster's Third International Dictionary for the word "whore"[3];

(c) One two occasions, Lisa Schrader may have encouraged or sought sexual advances while plaintiff was in ancillary intimate relationships. One was during his marriage, but that advance, if it could be referred to as such, was a happenstantial non-starter and materially inconsequential ("My boob fell out.")

C. Factual and psychological assessment required to comprehend potential root cause

In two active and interconnected cases, plaintiff has embarked upon a hurried armchair psychological assessment. One lawsuit and assessment process focused upon odd mannerisms and behaviors found in a work environment, those mannerisms supporting specific psychological designations (i.e., narcissism or irrational superiority complexes) which lead to tortious acts such as defamation, the other relates to the same process conducted upon nuclear and extended family members. See No. 22-1089 (W.D. Tex.) and No. 22-2197 (N.D. Oh.).

Unfortunately, it appears plaintiff must embark upon a similar process via this suit presuming the negative (i.e., he has been negatively adjudged by the group) and, instead of defending himself, must assess mutual wrongdoings, reasons therefore and develop likely conclusions; in other words, he

---

[2] See *Road House* (1989): J. Dalton: "Be nice." Bar Worker: "What if he calls my mother a whore?" J. Dalton: "Was she?"

[3] From an online source, the term means, as a verb, "to pursue a faithless or idolatrous desire"; as a noun, the word can mean "a promiscuous or immoral woman."

1   must assess those passing errant judgment upon him. That output will then drive the questions,

2   answers and assessment which follows: Who said what, to whom, when, how many times, how did

3   the information travel and how does that information compare to what did or did not actually occur,

4   properly assessed? Were any specific punishment actions enacted based upon falsified information

5   and how is the entire matter corrected?

6

7   D.  Request for information collection and in-confidence assessment

8   One of the named defendants is Edward Haravon, a former friend of both plaintiff and his former

9   wife. Plaintiff suggests Mr. Haravon collect all information contained by and transmitted through the

10  group relative to plaintiff, subject to his concurrence, that information enumerated by category below.

11  He is to hold that information in confidence as it will both be compared to information plaintiff will

12  file in this docket as well as be required by Federal authorities (DEA, FBI and DHHS).

13

14  That information pertains to:

15  (1) Sexual activity in the social network affecting plaintiff in any way;
    (2) Any unlawful drug usage or transactional efforts in the social network affecting plaintiff;
16  (3) All sexual activity known or rumored to be present, that activity deemed pertinent to the
        Swartz-McInerney marriage;
17  (4) Any information painting plaintiff in negative light held by the group.

18
    After the court opens the docket, and in order to supply factual anecdotes in support of the
19
    conclusions drawn, a memorandum, or several, will be attached to this complaint offering facts,
20
    interpretations, relevance and psychological assessments of the social group so named. See, as
21
    example, the supplements found within No. 22-2197 (N.D. Ohio) and No. 22-1089 (W.D. Tex.).
22

23  **V.  Reason Dictates Remedy**

24
    A person's actual reputation maintains tangible and intangible value. In other words,
25
    plaintiff's actual reputation, when translated into monetary terms, maintains tangible property value
26
    and that value has been greatly reduced by defendants' consolidated actions.
27

28  //

No.                                                                              Page 6 of 9
Complaint

The harm to plaintiff's reputation, presuming it occurred, is therefore an Amend. XIV, § 1[4] violation regarding property de-valuation, similar to what makes theft or vandalism remediable via monetary means. The defamation has most likely been severe, included multiple acts and occurred between multiple parties transmitting damaging information across state lines.

As *Marsden* was not case law before *Marsden*, RICO becomes similarly and statutorily relevant to inter-state defamation matters.

The following process and remedy components are warranted.

(a) <u>Complete and accurate discovery</u>

Plaintiff in this action, embarking on a strikingly similar effort related to illegalities endured during a 10-year career in business technology, suggests two simultaneous actions: (a) defendants perform self-discovery and (b) plaintiff will develop his own output from memory. The two outputs will be compared, focusing upon accuracy and comprehensiveness.

(b) <u>Injunctive relief</u>

Due to sustained and repeated defamation propagated among the group to date, the court will restrict them from discussing plaintiff's actions, reputation, state of mind, health, work and scholastic performance or anything having to do with his person in any way, shape or form save for information given to Mr. Haravon, Federal authorities, or the law firm the court appoints, for the purposes outlined in this suit for a timeframe of 3 years or as the court sees proper.

(c) <u>Monetary remedy</u>

At this point, plaintiff cannot assess the monetary value of time and life enjoyment lost, he can only suggest that the camaraderie provided via the social network he once enjoyed comprised a

---

[4] "…nor shall any state deprive any person of life, liberty, or property, without due process of law."

No.
Complaint

substantial portion of his total life enjoyment. He views absences from Men's Dinners and Christmas parties as "improperly withheld benefits."

    (d) <u>Declaratory remedy in the form of a public Findings of Fact and Conclusions of Law document</u>

A portion of the remedy may include a public statement detailing the harm performed, the extent of that harm as well as the persons performing that harm.

    (e) <u>Monetary Remedy</u>

$75,100, or an amount the court deems prudent, paid by all parties so named within.

**VI.   Conclusion**

A. <u>Policy concerns related to narcotics and sexual endeavors</u>

Plaintiff is aware that several people in this group attended law school and, in so doing, must have contemplated their own misdeeds vis-à-vis policy. Therefore, he poses the following questions, relative to this suit and his situation:

(1) Presuming the group is responsible for narcotic policy in the United States, that policy driving enforcement throughout the nation, what is their perspective on what substances are permitted, for whom and under what conditions? How does their answer relate to employers, relationships and the social circle so named? How does that policy relate to a person's ability to properly assess situations? How does their view affect plaintiff?

(2) Per Q1, rationalize $\sum$(Fed+State+Local) expenditures on drug enforcement and rehabilitation vis-à-vis the group's policy. More specifically, if the DEA risks their lives combatting narcotic inflows, are there any behaviors within the group which may counteract those efforts? Are those policy errors on the part of the government or counteracting/counter-productive illegalities requiring remedy?

(3) Per Q1, rationalize and discuss the group's views as to setting examples for children, their own or as mentors to same, vis-à-vis experimental narcotic usage.

(4) As it pertains to pre-marital contracts, make a list of all topics the group believes relevant prior to a marital contract's lawful establishment. What is the process to ensure the contract is valid, the conditions of the contract thoroughly comprehended and the two human products fully vetted and informed prior to merging?

//

No.
Complaint

B. Social network membership

The following are persons deemed part of the Chicago-Miami-based social network for purposes of this suit, in the order they may have pertinent facts or opinions relative to plaintiff, his former marital relationship and his reputation: Erich and Sara Stovall (Cleveland, Ohio), Will and Hannah Harbaugh, David and Jenny Streicker (Chicago, IL), Mark and Kim Willis (Denver, CO), Jeff and Abby Burtelow (Chicago, IL), Lindsey LaForte (Chicago, IL), Kara & Ed Haravon (Chicago, IL), Chris Clark, Jay Livingston, Peter Duggan, Jennifer McInerney, Brad Skelley, Brent Knott, Andrew Hughes, Michael Hughes and Lisa Schrader.

C. Ancillary federal concerns

Two additional concerns are embedded within the suit: the network within, or part of it, may have caused plaintiff's substantial economic collapse and the periodic violence he has endured.

Respectfully,

Arthur Thyme
frank.wright9@gmail.com

Date: 12/21/2022